United States District Court
Middle District of Florida
Jacksonville Division

**ALEXSIS MARIE KENT FIERRO,**

***Plaintiff,***

**v.** **NO. 3:25-CV-913-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

***Defendant.***

---

# Order

Proceeding under 42 U.S.C. § 405(g), the plaintiff requests judicial review of a final decision by the Commissioner of Social Security. Doc. 1. The procedural history, evidence, and law are summarized in the Administrative Law Judge's (ALJ's) decision, Tr. 1157–72, and the parties' briefs, Docs. 8, 15, 16, and not fully repeated here. The pertinent period is February 4, 2019, to March 31, 2023.

## 1.

Section 405(g) details the scope of review:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner …, with or without remanding the cause for a rehearing. The findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner … or a decision is rendered under subsection (b) of this section which is adverse to an individual

> who was a party to the hearing before the Commissioner …, because of failure of the [plaintiff] or such individual to submit proof in conformity with any regulation prescribed …, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoted authority omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019); *see also id.* at 108 (describing a case-by-case inquiry about vocational expert testimony that "defers to the presiding ALJ, who has seen the hearing up close").

**2.**

On November 8, 2021, the plaintiff, insured through March 31, 2023, applied for Disability Insurance Benefits (DIB), alleging that she had become disabled on October 1, 2016, at age 28, due to post-traumatic stress disorder (PTSD), anxiety, and panic attacks. Tr. 225, 1415–19. Her claim was denied at the initial and reconsideration levels. Tr. 74–81, 84–90. At her request, the ALJ conducted a hearing, at which the plaintiff, represented by counsel, and a vocational expert testified. Tr. 38–73, 115–16.

On February 16, 2023, the ALJ found that the plaintiff was not disabled. Tr. 1255. The plaintiff requested review, and the Appeals Council denied the request, finding no reason under the rules to review the decision. Tr. 1–3.

The plaintiff appealed to this court, and, on July 12, 2024, the court remanded the case, finding that the ALJ had erred by failing to consider the "severe unpredictable fluctuations" of the plaintiff's mental functioning, especially as it relates to her PTSD. Tr. 1210–25. The court observed that although the plaintiff could care for her children and house on good days, on bad days, when her symptoms worsened unpredictably, a friend, her mother, or her husband would help. Tr. 1222. The court found that it was unclear whether the ALJ had considered the fluctuations. Tr. 1224.

On July 25, 2024, the Appeals Council issued its remand order, directing the ALJ to conduct proceedings "consistent with the order of the court." Tr. 1230.

On February 10, 2025, the same ALJ conducted another hearing, at which the plaintiff, again represented by counsel, and a vocational expert testified. Tr. 1180–1208. Before that date, the plaintiff amended her alleged onset date to February 4, 2019. Tr. 207, 1432.

The ALJ found that the plaintiff was insured through March 31, 2023, and had not engaged in substantial gainful activity since February 4, 2019. Tr. 1159.

The ALJ found that, during the relevant time period, the plaintiff had had severe impairments of depression, generalized anxiety disorder with panic, and PTSD. Tr. 1160. The ALJ found that the plaintiff's other impairments—obesity, tinnitus, psoriasis, and gastroesophageal reflux disease—had been non-severe. Tr. 1160. The ALJ stated that he had considered all of the plaintiff's impairments in assessing her residual functional capacity (RFC). Tr. 1160.

The ALJ found that, during the relevant time period, the plaintiff had had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 1160.

The ALJ found that, in the area of understanding, remembering, or applying information, the plaintiff had had a mild limitation. Tr. 1160. The ALJ based the finding on the facts that mental status exam findings from the plaintiff's Veterans Administration (VA) providers consistently noted intact recent and remote memory and estimated average intellectual functioning, and that Dr. Peter Knox noted no deficits of memory during his consultative psychological evaluation. Tr. 1160.

The ALJ found that, in the area of interacting with others, the plaintiff had had a moderate limitation. Tr. 1161. The ALJ based the finding on the facts that the plaintiff lived with family and related relatively well with them; that she had attended church before COVID; that she shopped in grocery stores despite reporting that she was anxious around people and her panic attacks had increased; and that she was described as cooperative, albeit sometimes presenting as irritable and angry. Tr. 1161.

The ALJ found that, in the area of concentrating, persisting, or maintaining pace, the plaintiff had had a moderate limitation. Tr. 1161. The ALJ based the finding on the facts that the mental status exam findings consistently showed intact attention and concentration, and that she could care for her children, prepare meals, and grocery shop. Tr. 1161.

The ALJ found that, in the area of adapting or managing oneself, the plaintiff had had a moderate limitation. Tr. 1161. The ALJ based the finding

on the facts that the plaintiff adjusted her grocery shopping to go during less crowded times; that providers consistently described her as pleasant and cooperative, though mental status exam findings noted that she had been irritable and angry on a few occasions; that providers noted she maintained adequate hygiene; that she lived independently in a house with her husband and two children; and that she could seek out medical care as needed. Tr. 1161.

The ALJ found that, during the relevant period, the plaintiff had had an RFC "to perform a full range of work at all exertional levels [physically,] but with the following nonexertional limitations":

> Mentally, the [plaintiff] cannot perform complex tasks, but can perform simple, routine tasks with concentration on those tasks for two-hour periods with normal breaks and lunch. She can occasionally interact with the public and supervisors but has no limitations working with coworkers. She must avoid frequent changes in the work setting.

Tr. 1161–62.

To explain the RFC, the ALJ summarized the plaintiff's testimony from the first hearing:

> The [plaintiff] previously testified that she was in the Navy from 2008 through 2012. She was part of the honor guard and worked at funerals every day. She has PTSD from witnessing the funerals. She attended up to 5 funerals [a] day and participated in the 21-gun salute. [She] stated that she also worked as a Transportation Assistant in the mili[t]ary and in passenger services. She stated she has been unable to continue working due to PTSD, severe anxiety, irritability, and panic attacks. She admits she has never been hospitalized for psychiatric complaints. She sees a psychiatrist and receives medications through the VA. [She] testified to side effects from the medication that include drowsiness, brain fog, and difficulty remembering

> things. She can have panic attacks up to twice daily. The frequency waxes and wanes depending on what triggers her. Triggers include being around groups of people or not feeling safe. People in general will trigger panic attacks. Triggers also include people talking about death and thinking about it. Driving past a cemetery triggers a panic attack. She does light cleaning around the house, laundry, and cooking light meals. She is able to take care of her children. Her husband helps a lot. When her symptoms worsen, her mother comes to stay with her to help. When her mother comes, she stays for a month or two. She comes to stay when her husband is away for a long time. Her mother came for a month one summer when she reported having a complete breakdown. She though[t] it might have been triggered by her grandfather passing away[,] combined with a lot of other changes. She reported her anxiety caused brain fog, difficulty focusing, and irritability towards the people she worked with. She also has obsessive compulsive tendencies[,] which worsened during covid. She will wash her hands until they bleed. She may run errands, go to the grocery store, attend doctors' appointments, or do something with the children after school. She is able to [go to] the grocery store and shop for grocer[ies]. She tries to go midafternoon when not busy. On a good day, her anxiety is under control. She does not attend any social activities. Her neighbors are a big help if she needs anything. Other than that, she does not have a social life. Prior to the pandemic, she occasionally attended church. She would speak to people she is close with.

Tr. 1162–63.

The ALJ also summarized the plaintiff's testimony from the second hearing:

> At the current hearing, the [plaintiff] testified that she continues to live in a house with her two children[,] who are now ages 14 and 8. Her children were able to assist with some things at home. She continues to hold a valid driver's license but only drives when necessary, such as grocery shopping or taking her children to school. He[r] husband continues to be in active military. She said she has also developed stomach issues that seem to be exacerbated by her panic attacks. Sometimes, her panic attacks occurred without any trigger. The[y] last 40-45 minutes. She underwent testing but was told they did not find anything other

> than an irritated stomach lining and told her the symptoms could be due to anxiety or stress. She continues to receive medication management with frequent adjustments and changes. She did say that her medications do seem to help. She has not required prolonged outpatient therapy or … any psychiatric hospitalizations.

Tr. 1163.

The ALJ stated that he had also considered a brief from the plaintiff's representative. Tr. 1163; *see* Tr. 1431–36.

The ALJ summarized the medical evidence:

> The evidence shows treatment through the [VA]. Progress notes from [the plaintiff's] primary care physician[,] Charlott Thornton, M.D.[,] in March 2019[,] described the [plaintiff] as angry and emotional (1[F/55–56] [Tr. 394–95]).
>
> The [plaintiff]'s primary care provider Saba Sajid, M.D.[,] referred [her] for a psychiatry consult in February 2020 after [she] reported complaints of insomnia, PTSD, mood changes, decreased energy[,] and OCD. Exam findings at that time noted a euthymic mood and normal affect (2F/16, 253-260 [Tr. 416, 653–60]).
>
> A psychological consult performed by Lynn Helder on March 27, 2020, noted subjective complaints of depression including intermittent sad mood, anhedonia, insomnia with night terrors occurring approximately twice a month, decreased appetite, isolation, indecisiveness, problems with concentration/short term memory, intermittent energy and motivation problems, and feelings of survivor's guilt. The [plaintiff] reported she quit her job which she enjoyed due to having panic attacks which she stated would happen all of a sudden and [she would] find herself "having a meltdown". She reports she may have an attack to [sic] three times a month or may go a couple of months with none. She stated she may sleep 8 hours/night or may [sleep] only 2–4 hours/night. She reported symptoms of PTSD including nightmares-awakens gasping for air, intrusive thoughts, hypervigilance, hyperstartle, detachment from others ("don't like people"), at times having feelings of guilt with past traumatic events. [She] reported having vague, passive thoughts of suicide 2

weeks ago, without intent or plan. She reported current stressors of moving and the COVID 19 virus. Mental status exam findings noted [she] was cooperative with good attention and concentration. Her mood was depressed and irritable. Memory was intact. She denied suicidal ideations. Assessment included a major depressive disorder and PTSD. Treatment recommendations included individual therapy and medication management (2F/21–23, 29, 227–235 [Tr. 421–23, 429, 627–35]).

A telephone visit with Dr. Helder in May 2020 notes complaints of anxiety related to the pandemic causing the [plaintiff] to wash her hands constantly. She reported a full-blown panic attack two weeks earlier. She continued to report being irritable and stated that coming to the clinic would make her more anxious (2F/214–215 [Tr. 614–15]).

Progress notes in June 2020 document reports of feeling stressed when going out in public and passive thoughts of dying. She reported good days and bad days. Treatment included the addition of Buspirone (3F/260–266 [Tr. 927–33]).

A social work visit in September 2020 noted reports of very high anxiety levels. [The plaintiff] stated that she did her job and did it well until she couldn't do it anymore. She was unable to forget the dead military members and their families. She could not take out the garbage because the smell reminded her of dead bodies. On examination, she was anxious but cooperative and pleasant. She was also tearful a few times. Diagnosis included PTSD (3F/250–252 [Tr. 917–19]).

Follow-up counseling records in October 2020, note the [plaintiff] reported often feeling like she wanted to die but she denied having any plan or intent. Most days she had to force herself to get out of bed and do the things that are needed to take care of herself and her family. She could not talk to her husband, family, or friends about the depths of her depression because they "don't get it." [She] expressed embarrassment about her behavior at times (she says she can be very irritable and angry). She was also embarrassed about being on medication. She continued to be diagnosed with PTSD, chronic (3F/243–245 [Tr. 910–12]).

Psychiatry follow-up in October 2020, show the [plaintiff] reported being more depressed. She was still having some anxiety but was taking Buspirone on an as needed basis instead of daily as prescribed. Sleeping was variable. She reported depression,

nightmares, intrusive thoughts, avoidance, hypervigilance, and detachment/numbness. Citalopram was increased and it was recommended she take Buspirone daily instead of as needed for improved efficacy (3F/234–240 [Tr. 901–07]). On follow-up in November 2020, records note she continued to [take] Buspirone as needed instead of on a daily basis as prescribed (3F/214–226 [Tr. 881–93]).

Psychiatric records in February 2021 noted the [plaintiff] indicated she was "not as bad.["] She reported the increased dosage of Citalopram was helping with depression, and Buspirone seemed to help with anxiety. She reported no improvement from the Melatonin. She did indicate her depression was better. She was still having symptoms of PTSD with recent triggers including nightmares, intrusive thoughts, avoidance, hypervigilance, and detachment/numbness. On examination, she was mildly anxious. She was prescribed Trazodone 50 mg and continued on Citalopram and Buspirone (3F/203–210 [Tr. 870–77]).

During a February 2021, primary care visit, the [plaintiff] had complaints of right[-]sided low back pain with right leg radiation. She continued to report insomnia (hard to fall [a]sleep), heavy periods, mood changes from depression to anxiety, decrease[d] energy and obsessive-compulsive symptoms. On examination, [she] had right[-]sided tenderness to palpation over paraspinal muscles/facet joints. She was diagnosed with PTSD; right[-]sided low back pain; and menstrual irregularities (3F/189–194 [Tr. 856–61]). In March 2021, an x-ray of her lumbar spine was normal (3F/269 [Tr. 936])[.] Additional mental status exam findings in February 2021 noted a depressed, anxious, and angry mood, but the [plaintiff] was cooperative with good eye contact, and intact recent and remote memory (2F/48–49 [Tr. 448–49]).

Psychological records in April 2021 document reports of anxiety and some health issues. The [plaintiff] rated her depression as mild, stating her current stressors included waiting on a biopsy result. She reported that the dose of Buspirone was not helping as much with anxiety and panic symptoms as it did in the past. She reports some days not feeling like doing the same activities that she does every day. She reported PTSD symptoms of nightmares, avoidance- of people, hypervigilance, hyper startle. Mental status exam findings noted an anxious mood and affect but described her as pleasant, appropriate, mood-congruent and neutral in amplitude. Treatment included increasing her Buspirone and continuing her other medications (3F/155–162 [Tr. 822–29])[.]

During a social work follow-up, the [plaintiff] reported she had taken on her sister's two children for the rest of the school year. She reported being more depressed than not lately, stating she did not get out of bed the day before. Her sleep was poor. Medical cannabis used to help her, but she stated that it no longer seemed to be helping. She continued to endorse passive suicidal ideations with no plan or intent to die (3F/151–152 [Tr. 818–19]).

During an August 2021 psychiatry follow-up, the [plaintiff] reported Buspirone was not helping with anxiety or panic attacks, so she stopped taking it. She reported increased anxiety, daily and panic attacks every other day. Mental status exam findings noted a dysphoric, stressed and anxious mood. She reported variable to poor sleeping. She was started on Alprazolam and continued on Citalopram, Melatonin and Trazodone (3F/134–142 [Tr. 801–09]).

Mental status exam findings in October 2021 were essentially unchanged with the exception of [the plaintiff's] mood being described as improved, stable, and euthymic with a pleasant affect (2F/73 [Tr. 473]). Mental status exam findings continued to note [she] was cooperative with a pleasant affect and good eye contact but note an anxious mood (2F/86, 106, 153, 3F/122–128 [Tr. 486, 507, 554, 789–95]).

Psychiatry notes in January 2022 document reports of down, sad, like something is wrong, and had to force herself to do anything. Mood was still depressed, anxious, irritable, and easily angered/agitated. She reported having a lack of patience, lack of motivation, poor sleeping of 4–5 hours due to racing thoughts, and ongoing thoughts of what could happen. She did not want to deal with anything lately and had not left her house in four days. She presented with mixed depression, anxiety. She reported severe intrusive thoughts of the funerals she had to attend during her military service at Arlington Cemetery. Treatment included increasing her dose of Trazodone to 100 mg. Her other medications were renewed (3F/97–107 [Tr. 764–74]).

An emergency room visit for abdominal pain and diarrhea on April 19, 2022, included a CT scan of the abdomen which showed mild colitis. Treatment included antibiotics (12F/27–28 [Tr. 1130–31]). [The plaintiff] also sought emergency room treatment for complaints of heart palpitations on April 29, 2022. Further workup from a visit in April 2022 was negative and providers

determined her symptoms were not cardiac related (12F/9 [Tr. 1112], 13F [Tr. 1437–43]).

During a social work appointment in July 2022, the [plaintiff] reported she had a nervous breakdown. She stated her marriage was falling apart because of her mental illness and her husband not knowing how to deal with it. She indicated she had to stop taking her medications. (4F/29–35 [Tr. 976–82]).

In August 2022, the [plaintiff] reported she continued to deal with medical issues and the recent passing of her grandfather. She stated she was still easily "triggered" which caused nightmares and flashbacks. Panic attacks had worsened in frequency, and she had decreased concentration. She was slightly irritable regarding prior provider wanting to have her on mood stabilizer agent, but overall cooperative. She was somewhat reluctant to increase in Sertraline despite uncontrolled anxiety. Her mood was tired, and her affect blunted. Thought process and associations were tangential and coherent. Attention and concentration were limited. Her Sertraline dosage was increased (4F/26 [Tr. 973]).

During a primary care visit in September 2022, the [plaintiff] reported a six-week history of weight loss and hair loss. She also continued to report insomnia, and mood changes due to depression and anxiety. She also reported decreased energy and obsessive-compulsive symptoms. Physical exam findings noted right[-]sided tenderness to palpation over the paraspinal muscles/facet joints. She had diffuse hair thinning. Her mood was euthymic and her affect was normal. Diagnoses included PTSD; right[-]sided low back pain; tobacco use; menstrual irregularities; tinnitus; seborrheic dermatitis; psoriasis; celiac disease; weight loss; GERD; abdominal pain; hair loss; and chest pain (4F/18–25 [Tr. 965–72]).

Other objective medical evidence includes an MRI of the brain performed in December 2022 showing no abnormalities (16F/208 [Tr. 1703]).

[Dr. Knox] performed a consultative psychological evaluation in October 2022. Mental status exam findings noted a euthymic mood and appropriate affect. [The plaintiff] was oriented to time, place, person, and purpose. Dr. Knox noted there were no behavioral indications of depression or thought disorder. There were no significant issues in concentration and persistence. Her memory appeared intact, and she had no significant impairments

> in work[-]related mental activities. [She] reported episodes of anxiety during which times she would not leave her bed. She estimated having bad days three times a week. If she had a good day, she was out of bed[;] she will clean and do laundry and she will cook some meals. She continued to have intrusive thoughts about the events of attended funerals, with her noting recurrent distress/anxiety, and avoidance of similar situations. In regard to social interaction and adaptation, [she] noted that an average day starts about 7:15 a.m. to get the children off to school. Diagnoses included PTSD and her Global Assessment of Functioning (GAF) score was estimated at 55 (5F [Tr. 991–96]). Dr. Knox opined the [plaintiff] would be off task 15% to 25% or be unable to effectively job [sic] tasks in a satisfactory manner for competitive employment (5F - 8F [Tr. 991–1023]). …
>
> Records from Boreland Groover clinic in January 2023 document evaluation for mild to moderate nausea. EGD studies showed acid reflux negative for H pylori or Barrett's esophagus. Biopsies were suggestive of possible celiac disease. A colonoscopy was normal. The [plaintiff] reported her symptoms markedly improved with following a gluten[-]free diet and Omeprazole (17F/3, 6, 11 [Tr. 1710, 1713, 1718]).
>
> Dermatology records in October 2022 and February 2023 document treatment for psoriasis consisting of topical steroids (14F/3, 8 [Tr. 1446, 1451]).
>
> Mental health records from the VA in February 2023 document the [plaintiff] reported feeling less depressed but stated she was always anxious. Mental status exam findings note [she] was alert and oriented times four. She was overall friendly and cooperative. She described her mood as "all right" stating she had her moments. Attention and concentration were adequate[.] Insight and judgment were fair to good. She denied suicidal or homicidal ideations (16F/159 [Tr. 1654]).

Tr. 1162–67.

The ALJ found Dr. Knox's opinion unpersuasive and provided this explanation:

> The undersigned does not find Dr. Knox's opinion persuasive as the severity of his proposed time off task is not supported by with

> [sic] his own mental status exam findings noting no significant issues in concentration and persistence with intact memory. It is also not supported by his statement that there were no significant impairments in work[-]related mental activities. It is also inconsistent with the mental status exam findings of the [plaintiff]'s counselors and psychiatric providers at the VA. These records also consistently note [she] was cooperative with good eye contact, and intact recent and remote memory despite a consistently depressed and anxious mood (2F/23, 48–49, 65, 75, 80, 224, and 3F [Tr. 448–49, 465, 475, 480, 624, 668–947]). The undersigned does note that Dr. Knox's assessed [GAF] score is consistent with the treatment record for chronic anxiety and depression and the activities as documented in the record. The undersigned has assigned moderate limitations of functioning in the areas outlined above in consideration of the overall evidence as a whole.

Tr. 1166–67.

The ALJ stated that, "[a]fter careful consideration of the evidence," he found that the plaintiff's medically determinable impairments could have reasonably been expected to cause her alleged symptoms, but her statements about their intensity, persistence, and limiting effects were inconsistent with the evidence. Tr. 1167.

Regarding the physical impairments, the ALJ gave this explanation:

> As for the [plaintiff]'s statements about the intensity, persistence, and limiting effects of … her symptoms, they are inconsistent because[,] in terms of [her] alleged physical impairments, the objective medical evidence is very limited. While [she] reports severe [PTSD] symptoms and anxiety with panic attacks, and has had several emergency room visits relating to complaints of heart palpitations, cardiac testing has been negative including the April 2022 ER visit (12F/9 [Tr. 1112]), and [she] has been assessed with noncardiac symptoms after negative testing, and the discharge notation of palpitations with a history of anxiety but no definitive diagnosis was given following the testing (12F et seq. [Tr. 1104–40]). [She] has a history of celiac disease and did undergo a laparoscopic cholecystectomy but recovered without noted

> complications. CT studies showed mild colitis that was successfully treated with antibiotics (11 F/12 et seq.). The undersigned also notes [she] has not required any extended hospitalizations for a physical problem. The physical exam findings and imaging studies and response to treatment do not support disabling physical impairments.

Tr. 1167.

Regarding the mental impairments, the ALJ gave this explanation:

> Notably, the [plaintiff] has complained of posttraumatic stress and associated anxiety but was not involved in combat but was with an honor guard and did funerals for the fallen soldiers and veterans who passed. While she has reported [a] balance of anxiety with panic, she has not required psychiatric hospitalization and[,] as was noted above[,] in the latest emergency room visit from April 2022, she has not been kept for her mental complaints since her alleged onset date (see exhibits 2F, 3F, 4F, 11F and 12F [Tr. 401–990, 1059–1140]). The evidence of record does show that while the [plaintiff] reported passing suicidal thoughts, she consistently denied having a plan or any prior suicide attempt. Records noted she has had [a] good response to the medications when she takes them. When they no longer seem to provide the same level of relief, her provider adjusts her medications as necessary (2F, 3F, 4F, 10F/10 and 12F/9 [Tr. 401–990, 1047, 1112]). However, over the course of treatment, no substantial changes were made to the treatment regimen, suggesting that the treating providers felt symptom management and control were adequate. There were times that the [plaintiff] adjusted or stopped taking medications on her own and was encouraged to take medications as prescribed. Records indicated improvement when she was taking her medications as prescribed and assigned her at low risk of suicide. The mental status exam findings outlined by treating and examining sources as outlined above are consistently less severe than the severity of her subjective allegations.
>
> The [plaintiff] also reports having good days and bad days estimating her bad days to be about three times a week. However, there are no corresponding changes in mental status exam findings outlined in the record to support [her] allegations of the frequency of her bad days. Dr. Knox noted a [GAF score] of 55,

> suggestive of moderately impaired functioning. Provider's assessments show no variability in the [plaintiff]'s presentation[,] noting that she is cooperative and pleasant most times despite having an anxious and depressed mood. Dr. Sal[a]nt noted the [plaintiff]'s panic attacks occurred weekly or less often (9F/8 [Tr. 1031]). Mental status exam findings from []her treating and examining sources noted no indication of labile moods. Concentration and attention are consistently noted as intact throughout her treatment records. Additionally, her appearance is consistently described as well nourished and in no acute distress (2F/94, 98, 138, 255 [Tr. 494, 498, 538, 655]). Treatment records also indicate the [plaintiff]'s medication management has helped to stabilize her symptoms and reduce the severity of her episodes on bad days. This combined with self-care and coping strategies provided in her counseling sessions would not reasonably be expected to preclude her ability to hold a full-time job. The [plaintiff]'s description of her functioning also suggest[s] she has learned [to] function more effectively by working around her symptoms using her good days to be productive and managing bad days with coping strategies such as enlisting the help of her children and taking medication to diminish the severity of her symptoms. The record also does not support the degree of off[-]task behavior proposed by Dr. Knox, for the reasons previously discussed above.
>
> In addition to conservative treatment and limited objective medical findings, the [plaintiff] has several activities which are inconsistent with [her] reports of disabling mental impairments. She notably is the primary caregiver for her two children as her husband works and was about to deploy for the Navy at the time of the hearing. The [plaintiff] testified that she drives on good days[,] taking the children to school, going to the doctor or grocery [shopping]. Records note that at one point, she also took in her sister's children for a time. She does light housework[,] including light cleaning, making light meals[,] and doing the laundry. She shops and is able to take care of her personal care needs. She attended church prior to Covid.

Tr. 1167–68.

The ALJ observed that the state agency medical consultants had determined that the plaintiff had no severe physical impairment, and the psychologists determined that she had no more than moderate mental

limitations. Tr. 1168; *see* Tr. 74–81, 84–90. The ALJ found the opinions persuasive because they were supported by the evidence summaries in the reports and by the evidence, "including the lack of objective medical evidence, conservative treatment, mental status exam findings, response to medication[,] and the [plaintiff]'s reported activities as outlined in the record." Tr. 1168–69. The ALJ noted that the psychologist at the initial level found moderate limitations in interacting with the public and coworkers and no limitations in interacting with supervisors, *see* Tr. 78, but the psychologist at the reconsideration level found moderate limitations in interacting with the public and supervisors and no limitations in interacting with coworkers, *see* Tr. 88. Tr. 1169. The ALJ found the latter opinion more consistent with the evidence, observing its consistency with "progress notes consistently documenting the [plaintiff] [wa]s pleasant and cooperative most of the time[,] with the exception of a few instances where she report[ed] being irritable." Tr. 1168. He added, "The [plaintiff]'s general anxiety and reports of stress would reasonably be expected to increase with supervisor interactions and therefore supports limitations on interaction." Tr. 1169.

The ALJ explained that he had considered the plaintiff's 100% VA disability rating and found it inconsistent with the evidence. Tr. 1169. He observed that the VA uses a different standard than the Social Security Administration. Tr. 1169. He added that the rating is "not entirely consistent with evidence showing the [plaintiff] has responded favorably to her psychiatric medications and has not required psychiatric hospitalization and has several activities of daily living[,] including being the primary caregiver of her children and temporarily taking in her sister's children." Tr. 1169.

The ALJ described a PTSD questionnaire completed by the plaintiff's psychologist:

> A PTSD questionnaire completed by the [plaintiff]'s psychologist Dr. Salant on February 4, 2019, indicated the [plaintiff] arrived early for her appointment. She observed the [plaintiff] displayed pressured speech, but her thoughts were goal[-]directed. Judgement and insight were good. She indicated the [plaintiff] had intermittent inability to perform activities of daily living, and disorientation to time and place. She did not observe any other symptoms attributable to PTSD. Dr. Salant opined [that] the [plaintiff] was capable of managing her financial affairs and did not require further primary care follow[-]up regarding any life-threatening finding from her evaluation. She indicated the [plaintiff] was highly afraid of death and may be becoming germ[o]phobic. [The plaintiff] slept with the light on and had smell hallucinations of cigarettes (9F [Tr. 1024–37]).

Tr. 1169. The ALJ did "not find this opinion wholly persuasive," explaining that "it is not supported by the mental status exam findings outlined in the VA records consistently noting the [plaintiff] [wa]s alert and oriented." Tr. 1169. But, he observed, "the record does report obsessive hand washing due to [f]ear of germs resulting in chapped hands. This is consistent with her indication of obsessional rituals." Tr. 1169. He added that "while the [plaintiff] does report stress in relationships, she is capable of being pleasant and cooperative with her providers despite symptoms of depression, anxiety, suspiciousness, and panic attacks." Tr. 1169. He further added that he had included in the RFC "moderate social and limitations on workplace changes in consideration of Dr. Salant's questionnaire." Tr. 1169. But, he found, "the record does not support a finding that the difficulties the [plaintiff] experiences in these areas preclude[] all functioning in these areas[]" because "[p]rogress notes document [she] report[ed] some improvement in her symptoms with medication and she continue[d] to participate in ongoing counseling and medication management." Tr. 1169. He noted that the

questionnaire "does not include a function-by-function assessment of the [plaintiff's] ability to perform work-related activities" and "is also inconsistent with [Dr. Salant's] notation that the [plaintiff] was at mild risk for suicide." Tr. 1169.

The ALJ found that, during the relevant period, the plaintiff had been unable to perform her past relevant work as a transportation specialist. Tr. 1170.

The ALJ observed that the plaintiff had been 35 years old on her date last insured, and thus a "younger individual," and possessed at least a high school education. Tr. 1170.

The ALJ found that, during the relevant period, considering the plaintiff's age, education, work experience, and RFC, she could have performed jobs that had existed in significant numbers in the national economy. Tr. 1170. The ALJ gave the jobs of hand packager, case loader operator, and routing clerk as examples. Tr. 1171. The ALJ observed that the vocational expert testified that, based on his knowledge and experience, those jobs would require very little interaction with a supervisor if the employee performed the job correctly. Tr. 1171.

The ALJ thus found that the plaintiff had not been disabled during the relevant period. Tr. 1171–72.

The plaintiff, through her lawyer, asked the Appeals Council to assume jurisdiction. Tr. 1358–66. The Appeals Council found no reason under its rules to do so, providing this explanation:

Pursuant to the remand from the U.S. District Court for the Middle District of Florida in accordance with the fourth sentence of section 205(g) of the Social Security Act, the ALJ issued a hearing decision dated February 21, 2025. After receiving an extension of time, you submitted exceptions disagreeing with the hearing decision on April 29, 2025. We considered the exceptions and exhibited them on the enclosed order (Exhibits 34B and 35B [Tr. 1358–66]).

You contend that the hearing decision fails to comply with the District Court's remand order because the decision again does not account for fluctuations in the [plaintiff]'s mental functioning. You argue that the way to account for such fluctuations would be through time off task or absenteeism limitations in the [RFC] assessment. In its remand order, the Court indicated that substantial evidence did not support the prior decision because it was unclear whether the ALJ "considered the [claimant's] fluctuating mental conditions when assessing her ability to maintain fulltime employment" (Exhibit 5A, page 15 [Tr. 1224]). This is distinguishable from the current decision because the ALJ acknowledged that the [plaintiff]'s mental functioning waxes and wanes and that the [plaintiff] has good days and bad days. The ALJ noted that there are no changes in mental status examination findings to support the [plaintiff]'s allegations of the intensity, persistence, and frequency of her symptoms during her bad days (Decision, page 12 [Tr. 1168]). Thus, it is clear that on remand the ALJ considered the [plaintiff]'s fluctuating mental functioning, as directed by the Court. The ALJ adequately explained how he formulated the RFC in accordance with Social Security Rulings 85-16 and 98-6p and specifically rejected time off task limitations (see Decision, pages 12–13 [Tr. 1168–69]). We do not find error based on the omission of an off-task limitation or absenteeism limitation based on the totality of the evidence and the rationale articulated by the ALJ in the decision. This exception is without merit.

You also contend that the RFC is unsupported because the decision does not address whether the [plaintiff] has pace limitations and does not explain why the [plaintiff] has no limitations with respect to her ability to interact with coworkers. The ALJ reasonably accommodated the finding of moderate limitation in the [plaintiff]'s ability to concentrate, persist, or maintain pace by limiting the [plaintiff] to the performance of simple, routine tasks in two-hour increments (Decision, page 5-6,

Finding No. 5 [Tr. 1161]). Although the ALJ did not specifically limit the [plaintiff]'s ability to maintain pace, the mental RFC limitations pertaining to the [plaintiff]'s ability to concentrate and persist are consistent with the prior administrative medical findings of the State agency psychological consultants, James Levasseur, Ph.D., and Mike Dow, Ph.D., who similarly did not restrict the [plaintiff]'s ability to maintain pace (Exhibits 1A and 4A [Tr. 74–81, 84–90]). In fact, at the initial level, Dr. Levasseur found that the [plaintiff] could complete tasks at an appropriate pace and sustain this work on a full-time basis (Exhibit 1A, page 6 [Tr. 79]). With respect to the [plaintiff]'s ability to interact with coworkers, the ALJ supported the lack of social limitation with coworkers by highlighting Dr. Dow's finding that the [plaintiff] did not have limitations on h[er] ability to interact with coworkers (Decision, page 13 [Tr. 1169]). The ALJ also explained that the progress notes consistently document the [plaintiff] being pleasant and cooperative, except for a few instances where she was irritable (Id. [Tr. 1169]). We find the RFC is supported by substantial evidence.

Lastly, you contend that the ALJ did not adequately evaluate the medical opinion of [Dr. Knox], who opined, among other limitations, that the [plaintiff] would be markedly limited (defined as [the] inability to perform the task satisfactorily for 15-25 percent of the time during an eight-hour workday) in the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Exhibit 6F, pages 2–3 [Tr. 998–99]). Under the current rules applicable to this case, an ALJ must evaluate the persuasiveness of the medical opinions and prior administrative medical findings by considering the factors of supportability and consistency (20 C[.]F[.]R[. § ]404.1520c). In finding Dr. Knox's opinion not persuasive, the ALJ found the assessed limita[ti]ons unsupported by Dr. Knox's mental status examination findings and inconsistent with the mental health treatment notes in the record (Decision, pages 10–11 [Tr. 1166–67]). We find the ALJ adequately evaluated Dr. Knox's opinion in accordance with the regulations.

> We find no basis for changing the ALJ's decision dated February 21, 2025. In addition, we find that the ALJ's decision complies with the orders of the U.S. District Court and Appeals Council. Furthermore, the decision is consistent with our applicable laws, regulations, and Social Security Rulings. We decline to assume jurisdiction.

Tr. 1141–43.

The plaintiff now returns to this court. Doc. 1.

**3.**

The plaintiff frames the issue in this way: "Whether the ALJ erred by failing to account for the 'total limiting effects' of [her] impairments pursuant to 20 C.F.R. §§ 404.1520c, 404.1529, and 404.1545(e), resulting in a decision that is not supported by substantial evidence." Doc. 8 at 1. She complains that, despite the court's remand order, the ALJ failed to consider her "highly variable mental health symptoms and limitations" by finding that she had had the same RFC as in the first decision. Doc. 8 at 19.

The Commissioner disagrees. Doc. 15. The Commissioner contends that a "reasonable mind," like the ALJ, could find that the plaintiff's "impairments limited her work-related functional abilities, but ultimately did not preclude her from performing all work." Doc. 15 at 1. The Commissioner observes that, unlike in the first decision, the ALJ acknowledges that the plaintiff's mental functioning waxed and waned, that she had good days and bad days, and that "there were no changes in mental status examination findings to support [her] allegations of the intensity, persistence, and frequency of her symptoms during her bad days." Doc. 15 at 8. According to the Commissioner, "the ALJ properly resolved conflicting evidence," and the plaintiff fails to show "that the ALJ improperly considered the evidence of record [and] her subjective

allegations, or … that the [RFC] finding was not supported by substantial evidence." Doc. 15 at 1.

The plaintiff replies by pointing to evidence from November 2022 to May 2023—four months before through two months after her date last insured—that she contends supports her descriptions of bad days and renders the Commissioner's "claim of 'no changes in mental status exam' … obviously false." Doc. 16 at 2 & n.2 (quoting Doc. 8 at 17).

**4.**

The first regulation on which the plaintiff relies, § 404.1520c, explains how the agency considers medical opinions and prior administrative medical findings for claims filed after March 27, 2017:

> (a) How we consider medical opinions and prior administrative medical findings. We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.
>
> (b) How we articulate our consideration of medical opinions and prior administrative medical findings. We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record. Our articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section

for those medical opinions or prior administrative medical findings in your determination or decision.

(c) Factors. We will consider the following factors when we consider the medical opinion(s) and prior administrative medical finding(s) in your case:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. ….

(ii) Frequency of examinations. ….

(iii) Purpose of the treatment relationship. ….

(iv) Extent of the treatment relationship. ….

(v) Examining relationship. ….

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

> (5) Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. ….
>
> (d) Evidence from nonmedical sources. We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section.

20 C.F.R. § 404.1520c.

The second regulation on which the plaintiff relies, § 404.1529, explains how the agency evaluates symptoms, including pain:

> (a) General. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.
>
> (b) Need for medically determinable impairment that could reasonably be expected to produce your symptoms, such as pain. Your symptoms, such as pain, fatigue, shortness of breath,

> weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present. Medical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques, must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. …. At the administrative law judge hearing or Appeals Council level of the administrative review process, the adjudicator(s) may ask for and consider the opinion of a medical or psychological expert concerning whether your impairment(s) could reasonably be expected to produce your alleged symptoms. The finding that your impairment(s) could reasonably be expected to produce your pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of your symptoms. We will develop evidence regarding the possibility of a medically determinable mental impairment when we have information to suggest that such an impairment exists, and you allege pain or other symptoms but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms.
>
> (c) Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work—
>
>> (1) General. When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work. In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you. We also consider the medical opinions as explained in § 404.1520c. Paragraphs (c)(2) through (c)(4) of this section explain further how we evaluate the intensity and persistence of your symptoms and how we determine the extent to which your symptoms limit your capacity for work, when the medical signs or laboratory findings show

that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain.

(2) Consideration of objective medical evidence. Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

(3) Consideration of other evidence. Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by

your medical sources, and observations by our employees and other persons. .... Factors relevant to your symptoms, such as pain, which we will consider include:

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(4) How we determine the extent to which symptoms, such as pain, affect your capacity to perform basic work activities. In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect

> you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

(d) Consideration of symptoms in the disability determination process. We follow a set order of steps to determine whether you are disabled. If you are not doing substantial gainful activity, we consider your symptoms, such as pain, to evaluate whether you have a severe physical or mental impairment(s), and at each of the remaining steps in the process. …. We also consider your symptoms, such as pain, at the appropriate steps in our review when we consider whether your disability continues. ….

> (1) Need to establish a severe medically determinable impairment(s). Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, are considered in making a determination as to whether your impairment or combination of impairment(s) is severe.
>
> (2) Decision whether the Listing of Impairments is met. Some listed impairments include symptoms usually associated with those impairments as criteria. Generally, when a symptom is one of the criteria in a listing, it is only necessary that the symptom be present in combination with the other criteria. ….
>
> (3) Decision whether the Listing of Impairments is medically equaled. If your impairment is not the same as a listed impairment, we must determine whether your impairment(s) is medically equivalent to a listed impairment. …. If the symptoms, signs, and laboratory findings of your impairment(s) are equivalent in severity to those of a listed impairment, we will find you disabled. If it does not, we will consider the impact of your symptoms on your [RFC].
>
> (4) Impact of symptoms (including pain) on [RFC]. If you have a medically determinable severe physical or mental impairment(s), but your impairment(s) does not meet or equal an impairment listed in appendix 1 of this subpart, we will consider the impact of your impairment(s) and any related symptoms, including pain, on your [RFC].

20 C.F.R. § 404.1529 (internal citations omitted).

The third regulation on which the plaintiff relies, § 404.1545(e), explains the RFC—the most that a claimant can still do despite her limitations, 20 C.F.R. § 404.1545(a)(1), (3)—and consideration of the total limiting effects of a claimant's impairments:

> Total limiting effects. When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your [RFC]. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; e.g., someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with those of light work activity on a sustained basis. In assessing the total limiting effects of your impairment(s) and any related symptoms, we will consider all of the medical and nonmedical evidence, including the information described in § 404.1529(c).

20 C.F.R. § 404.1545(e). The ALJ is responsible for assessing the RFC based on all relevant evidence of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).

**5.**

Contrary to the plaintiff's argument, the ALJ considered the evidence and the total limiting effects of the plaintiff's impairments, considered and evaluated the medical opinions and prior administrative medical findings, and evaluated the plaintiff's symptoms, all in accord with the regulations. As the excerpted portions of the decision demonstrate, the ALJ considered the plaintiff's subjective complaints, her activities, the objective medical findings,

the type of treatment she received, the medication she took, the state agency determinations, and the medical opinions. Unlike in the first decision, the ALJ considered that the plaintiff had good and bad days and explained why the RFC sufficed. *See* Tr. 1168. Substantial evidence supports the ALJ's findings, and includes this evidence on which the ALJ relied:

- The state agency psychological consultants determined the plaintiff was not disabled. Tr. 1168–69; *see* Tr. 74–81, 84–90.

- The plaintiff complained about PTSD and anxiety, but had not served in combat. Tr. 1167.

- The plaintiff cared for herself, was the primary caregiver of her two children, and had even taken care of her sister's children for a time. Tr. 1168.

- The plaintiff had not received treatment indicative of disabling mental impairments, including because she had not required psychiatric hospitalization. Tr. 1167.

- The plaintiff has never planned or attempted suicide. Tr. 1168.

- The plaintiff responded well to medication when she took it and had her medication adjusted as warranted. Tr. 1168.

- The plaintiff had no substantial change to her treatment regimen, suggesting that her providers felt that her symptom management and control were adequate. Tr. 1168.

- The mental status examination findings did not suggest labile moods or the symptom severity that the plaintiff claimed. Tr. 1168–69; *see* Tr. 494, 498, 538, 655.

- Dr. Knox noted a GAF score of 55, which suggests only moderately impaired functioning. Tr. 1168; *see* Tr. 991–96.

- Dr. Salant noted that the plaintiff's panic attacks occurred weekly or less often. Tr. 1169; *see* Tr. 1031.

- The plaintiff's concentration and attention were consistently noted as intact. Tr. 1168.

- The plaintiff was consistently described as well-nourished and in no acute distress. Tr. 1168.

- Dr. Salant observed that the plaintiff's thoughts were goal-directed, her judgment and insight were good, she could manage her financial affairs, and she did not require primary care follow-up regarding any life-threatening findings. Tr. 1169.

- The VA records consistently noted that the plaintiff was alert and oriented. Tr. 1169.

- The plaintiff was pleasant and cooperative with her providers. Tr. 1169.

The plaintiff argues that the ALJ, in a "boilerplate" fashion, relied on her improvement by using a "highly selective recitation of the underlying record." Doc. 8 at 23. To the contrary, the decision reflects consideration of this unique record and all of its parts, including parts that would support a disability finding.

To the extent the plaintiff challenges the decision by relying on evidence that she contends supports her descriptions of bad days and renders the Commissioner's "claim of 'no changes in mental status exam' … obviously false," *see* Doc. 16 at 2 & n.2 (quoting Doc. 8 at 17), the challenge fails. The ALJ explained, "The [plaintiff] also reports having good days and bad days[,] estimating her bad days to be about three times a week. However, there are no corresponding changes in mental status exam findings outlined in the record to support the [plaintiff]'s allegations of the frequency of her bad

days." Tr. 1168. The ALJ supported his finding about the frequency of the plaintiff's bad days with substantial evidence, described above. The court may not reweigh the evidence. *See Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir. 2021) (explaining that a court may not decide facts anew, make credibility findings, or reweigh evidence). The issue is whether substantial evidence supports the ALJ's finding, not whether some evidence may support a different finding. *See, e.g.*, *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1282 (11th Cir. 2004) ("If the Commissioner's decision is supported by substantial evidence, we must affirm, even if the proof preponderates against it."). Remand is unwarranted.

**6.**

The Commissioner's final decision is **affirmed**. The clerk is **directed** to enter judgment for the Commissioner of Social Security and against Alexsis Marie Kent Fierro and close the file.

**Ordered** in Jacksonville, Florida, on September 21, 2026.

Patricia D. Barksdale
*United States Magistrate Judge*